MORGAN, LEWIS & BOCKIUS LLP
BRETT M. SCHUMAN, State Bar No. 189247
JOANNA K. SAX, State Bar No. 249124
One Market, Spear Street Tower
San Francisco, CA 94105-1126
Tel: 415.442.1000
Fax: 415.442.1001
E-mail: bschuman@morganlewis.com
E-mail: jsax@morganlewis.com

Attorneys for Plaintiff
Inc21.com Corporation d/b/a GlobalYP.net

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| Inc21.com Corporation d/b/a GlobalYP.net,<br><br>                    Plaintiff,<br><br>            vs.<br><br>Ma Sheila Flora, Tracy Gomez, Hubbub Inc., LKU Commtech Central, I2C-Intelligence to Communicate, Inc., Intelcon Call Center, Badoles, Inc., Pelatis BPO Solutions, Prolific Contract Central, Technocall Corp., Digicall Inc., Zynergy Solutions, and Contact Central Solutions, Inc.<br><br>                    Defendants. | Case No. C 08-02967 WHA<br><br>**PLAINTIFF INC21' S FIRST AMENDED COMPLAINT FOR VIOLATION OF THE TELEMARKETING AND CONSUMER FRAUD AND ABUSE PREVENTION ACT, BREACH OF CONTRACT, NEGLIGENCE, AND FRAUD**<br><br>**DEMAND FOR JURY TRIAL** |

1      Plaintiff Inc21.com Corporation d/b/a GlobalYP.net ("Inc21") states and alleges as

2 follows:

3                                    **THE PARTIES**

4      1.  Inc21 is a California corporation with its principal place of business in San Francisco,

5 California.

6      2.  Upon information and belief, Ma Shelia Flora is an individual and a resident of the

7 Philippines.

8      3.  Upon information and belief, Tracy Gomez is an individual and a resident of the

9 Philippines.

10     4.  Upon information and belief, Hubbub, Inc. is an entity located, with its headquarters

11 and principal place of business, in the Philippines.

12     5.  Upon information and belief, LKU Commtech is an entity located, with its

13 headquarters and principal place of business, in the Philippines.

14     6.  Upon information and belief, I2C- Intelligence to Communicate, Inc. is an entity

15 located, with its headquarters and principal place of business, in the Philippines.

16     7.  Upon information and belief, Intelcon Call Center is an entity located, with its

17 headquarters and principal place of business, in the Philippines.

18     8.  Upon information and belief, Badoles, Inc. is an entity located, with its headquarters

19 and principal place of business, in the Philippines.

20     9.  Upon information and belief, Pelatis BPO Solutions, is an entity located, with its

21 headquarters and principal place of business, in the Philippines.

22     10. Upon information and belief, Prolific Contract Central, is an entity located, with its

23 headquarters and principal place of business, in the Philippines.

24     11. Upon information and belief, Technocall Corp., is an entity located, with its

25 headquarters and principal place of business, in the Philippines.

26     12. Upon information and belief, Digicall, Inc. is an entity located, with its headquarters

27 and principal place of business, in the Philippines.

28     13. Upon information and belief, Zynergy Solutions is an entity located, with its

1    headquarters and principal place of business, in the Philippines.

2        14. Upon information and belief, Contact Central Solutions, Inc. is an entity located, with

3    its headquarters and principal place of business, in the Philippines.

4                                    **JURISDICTION**

5        15. This court has jurisdiction pursuant to 28 U.S.C. § 1331.  This action arises under The

6    Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6101 *et seq.*, and the

7    matter in controversy exceeds $50,000, exclusive of interest and costs, against at least one

8    individual defendant.

9        16. This court has jurisdiction pursuant to 28 U.S.C. § 1367.  All of Inc21's claims are so

10   related to the claims in the action within such original jurisdiction that they form part of the same

11   case or controversy.

12       17. This court also has jurisdiction pursuant to 28 U.S.C. § 1332.  There is complete

13   diversity between the parties and the matter in controversy exceeds $75,000, exclusive of interest

14   and costs, against at least one individual defendant.  Inc21 is a resident of California.  All

15   Defendants are residents of the Philippines.

16       18. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.  Further, the parties

17   agreed, via contract, that San Francisco, California shall be the proper forum for any litigation.

18                    **Inc21's Business and Process for Selling Subscriptions**

19       19. Inc21 is a provider of internet based services for small businesses including, among

20   other things, maintaining internet yellow pages.  Inc21 contracts with brokers to locate call

21   centers to contact potential subscribers, via telephone, to sell subscriptions to Inc21's global

22   yellow pages internet sites.

23       20. In 2007, Inc21 contracted with brokers Ma Sheila Flora ("Flora") and Tracy Gomez

24   ("Gomez") to locate call centers in the Philippines.  True and correct copies of the contracts

25   between Inc21 and Ma Sheila Flora and Tracy Gomez (collectively "Broker Agreements") are

26   attached hereto as Exhibits A and B, respectively.

27       21. Flora and Gomez were primarily responsible for procuring and developing

28   relationships with prospective call centers.  Flora and Gomez received a commission for each

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

Plaintiff Inc21's First Amended Complaint for Violation of the Telemarketing and Consumer Fraud and Abuse
Prevention Act, Breach of Contract, Negligence, and Fraud; C 08-02967 WHA

1   valid sale by a call center that the broker represents.  In addition, Flora and Gomez were aware of

2   the amount of commission paid to each call center for a valid sale.  The Broker Agreements

3   contained the following terms:

4        ▪  *BROKER* and *VENDOR* wish to enter into this BROKER AGREEMENT

5          whereby BROKER will assist *VENDOR* in developing relationships with

6          prospective call centers subject to the terms and conditions of this BROKER

7          AGREEMENT.  Exhibits. A and B at 1.

8        ▪  For all referred call centers which perform the GYP [i.e. Inc21] program

9          Commission payments to the *BROKER* is one dollars [*sic*] ($1) per each

10         approved valid sale completed by the center to which the *BROKER*

11         represents." *Id.*

12      22. Once the broker locates the call center and assists in developing the relationship

13  between Inc21 and the call center, each call center completes a standard-form Agent Application.

14  The Agent Application contains both the name of the agent with authority to bind the call center

15  and the name of the call center.  A true and correct copy of an exemplar Agent Application that

16  each of the Defendants Hubbub Inc., LKU Commtech Central, I2C- Intelligence to Communicate,

17  Inc., Intelcon Call Center, Badoles, Inc., Pelatis BPO Solutions, Prolific Contract Central,

18  Technocall Corp., Digicall Inc., Zynergy Solutions, and Contact Central Solutions, Inc.,

19  (collectively "call centers") executed is attached hereto as Exhibit C.

20      23. Upon approval of the Agent Application, Inc21 and the call center execute a standard-

21  form Marketing Agreement that establishes the terms of the relationship between Inc21 and the

22  call center.  A true and correct copy of an exemplar executed Marketing Agreement entered into

23  with each of the Defendant call centers is attached hereto as Exhibit D.  Pursuant to the Marketing

24  Agreement, Inc21 agreed to pay the call centers a $25 commission for each valid/successful sale.

25  The Marketing Agreements include the following terms:

26       ▪  Each call in which a customer is willing to commit, likely to commit, or shows

27         reasonable interest in the Program Offering as set forth below, must be

28         recorded in full from the time the customer's voice is heard until the call has

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Plaintiff Inc21's First Amended Complaint for Violation of the Telemarketing and Consumer Fraud and Abuse
Prevention Act, Breach of Contract, Negligence, and Fraud; C 08-02967 WHA

1    ended.  Exhibit D at 3.

2       ▪ MARKETER agrees to keep and maintain Disposition Reports, which provide

3          statistical data regarding the status of calls and customer information.  *Id.*

4       ▪ In exchange for successful sales made by MARKETER, PROVIDER agrees to

5          compensate and/or pay a commission to MARKETER for each

6          valid/successful sale.  *Id.* at 4.

7       ▪ PROVIDER [Inc21] shall only pay commission on seventy percent (70%) of

8          the total valid/successful sales.  Under no circumstances shall PROVIDER pay

9          commissions on more than seventy percent (70%) of the total valid/successful

10         sales.  Commission shall be at a rate of twenty five dollars ($25.00) for each of

11         the valid/successful sales after the above thirty percent (30%) has been

12         subtracted.  *Id.* at 8.

13   24. To deter fraudulent or deceptive business practices, the Marketing Agreement contains

14   a liquidated damages clause of $500 assessed against any fraudulent sale.  *See id.* at 10.

15   25. Inc21 contracted with Voicelog, a third-party verification ("TPV") service provider, to

16   record TPV calls during the time period that Inc21 conducted business with the Defendant call

17   centers.  TPV recordings were then subsequently reviewed by another independent third party

18   company.  Upon a potential customer showing interest in Inc21's subscription service, the call

19   center was required to immediately connect the customer with the TPV service provider to record

20   and consummate the sale with the actual customer.  The third party TPV review provider would

21   then review each TPV recording and report to Inc21 those TPV recordings which it deemed to

22   "pass" (sale) or "fail" (not a sale) based upon the perceived customer responses contained in the

23   TPV recording.  Inc21 and each call center executed a standard-form Addendum to the Marketing

24   Agreement ("Addendum") providing for TPV services to be conducted on all sales calls by a third

25   party provider.  As part of the Addendum, the call centers agreed that the telemarketers could

26   remain on the line during the third-party verification process with the potential customer;

27   however, the telemarketer was to remain completely silent unless the customer specifically asked

28   the telemarketer a direct question.  A True and correct copy of an exemplar Addendum executed

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

Plaintiff Inc21's First Amended Complaint for Violation of the Telemarketing and Consumer Fraud and Abuse
Prevention Act, Breach of Contract, Negligence, and Fraud; C 08-02967 WHA

1   with each Defendant call center is attached hereto as Exhibit E.

2       26. Following the execution of agreements, the telemarketers were provided a training

3   session by Inc21 via telephone. Once trained, the telemarketers are provided by Inc21 with

4   "leads," which are lists of potential customer information including telephone numbers,

5   addresses, and other information. The telemarketers then call the leads. Pursuant to the

6   Marketing Agreement, each telemarketer is to create a disposition report for each call to describe

7   the contents of the call. If, during the call, a telemarketer determines that the lead is interested in

8   a subscription, the telemarketer connects the customer to TPV. The TPV system then asks the

9   lead a series of questions to consummate the sale.

10      27. Upon consummation of a sale, the new customer receives a Welcome Letter from

11  Inc21. The customer is informed that the customer has 15 days to cancel the subscription without

12  charge. Following the 15 day window, the customer is charged the subscription rate.

13                              **The Fraud Perpetrated By Defendants**

14      28. In the summer of 2007, Inc21 received an influx of customer complaints, both from

15  the actual customers and via several State Attorney Generals informing Inc21 that these

16  customers never received a telephone call, did not agree to an Inc21 subscription, or had no

17  recollection of ever being sent to a TPV service provider after the initial sales call. Inc21 agreed

18  to cancel, credit or refund all of the customer's accounts that complained.

19      29. Inc21 investigated these complaints and determined it had been defrauded by call

20  centers, brokers and also possibly the TPV service provider. Through its investigation, Inc21

21  learned that the call centers employed fraudulent techniques, including, but not limited to, using

22  digitized and recorded responses to the questions posed by the TPV. Inc21 learned that, in most

23  instances, no customer was actually on the telephone line during the TPV process. Instead, the

24  call center would connect to the TPV and simply play the digitized or recorded responses in such

25  a way that the TPV review would classify the call as a valid sale.

26      30. The use of "doctored" audio was extremely difficult for Inc21 to detect, particularly in

27  light of the fact that the sales were deemed valid by the TPV review provider. As a result, Inc21

28  paid over $250,000 in commissions on fraudulent sales because of the lag time between when a

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
5
Plaintiff Inc21's First Amended Complaint for Violation of the Telemarketing and Consumer Fraud and Abuse
Prevention Act, Breach of Contract, Negligence, and Fraud; C 08-02967 WHA

1   commission was paid on a purportedly valid sale by Inc21 and the time by which a potential

2   customer may lodge a complaint or cancel a subscription. Even though Inc21 diligently

3   contracted with brokers to locate legitimate call centers and that Inc21 contracted with TPV

4   provider and reviewer to verify all the sales, Inc21 fell prey to the fraudulent telemarketing

5   techniques.

6       31. In addition to the commissions paid to the brokers and call centers for the fraudulent

7   sales, Inc21 also incurred penalties by way of charge-back fees. A charge-back penalty occurs

8   when a customer complains to their billing provider about the subscription charge on their

9   telephone bill, the billing provider would remove the charge, and then the billing provider

10   assessed a penalty fee to Inc21 for the removal of the charge.

11       32. As part of its investigation into the fraud, Inc21 requested that the call centers provide

12   the recordings for all of the telephone calls. None of the defendant call centers provided the

13   requested recordings. The Marketing Agreement provides: "Each and every communication

14   made with customers shall be recorded from the time the customer's voice or likeness is

15   perceptible, or meaning can be deciphered from the communication." Exhibit D at 3.

16       33. Inc21 attempted to contact each broker and each call center about the fraudulent

17   activity and to discuss an opportunity to cure, but Inc21 received no response. Pursuant to the

18   Marketing Agreement, the call centers agreed to forfeit fees and/or commissions should any

19   provision of the Marketing Agreement be violated. Specifically, the Marketing Agreement

20   provides:

21          ■  Each party shall have the opportunity to remedy breach or noncompliance of

22            this Agreement. Remedy shall include, but is not limited to, successful and

23            strict compliance with the terms of this Agreement whereby such compliance

24            still satisfies the purpose(s) of this Agreement." Exhibit D at 15.

25          ■  Under its sole discretion, [Inc21] may exercise a contractual right, set forth by

26            this Agreement, not to pay fees, costs, or commissions otherwise due to

27            MARKETER, as a remedy for breach, failure to perform obligation, or non-

28            compliance with the terms of any part of this Agreement. Id. at 14.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

Plaintiff Inc21's First Amended Complaint for Violation of the Telemarketing and Consumer Fraud and Abuse
Prevention Act, Breach of Contract, Negligence, and Fraud; C 08-02967 WHA

1    34. Inc21 has ceased doing business with the defendant brokers and all the call centers

2    that defrauded it as described above.

## FIRST CLAIM FOR RELIEF
**Violation of The Telemarketing and Consumer Fraud and Abuse Prevention Act,**
**15 U.S.C. 6101 *et seq.***
**(Against All Defendants)**

6    35. Inc21 affirms and realleges the allegations set forth in paragraphs 1 through 34,

7    inclusive, of the Complaint as though fully set forth herein.

8    36. The Telemarketing and Consumer Fraud and Abuse Prevention Act ("Act") authorizes

9    a civil action against a person(s) who engages in activity in violation of the rules of the Federal

10   Trade Commission ("Commission") under the Act.

11   37. The brokers and call centers engaged in a pattern and/or practice of telemarketing

12   which violate the rules of the Commission.

13   38. Inc21 has been adversely affected by the pattern and practice of the brokers and call

14   centers that violate the rules of the Commission.

15   39. Inc21 has been damaged as a result of Defendants' violation of the Act. The brokers

16   and call centers misrepresented to Inc21 that the sales were valid and accepted commission

17   payments from Inc21. Furthermore, the brokers and call centers use of deceptive telemarketing

18   practices caused Inc21 to incur fees from the charge to alleged customers for Inc21 subscriptions

19   services. When the alleged customer canceled the subscription – to which it had never actually

20   agreed – Inc21 incurred charge-back fees from the service providers.

21   40. Inc21 has been damaged as a direct and proximate result of Defendants abusive and

22   deceptive practices in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
**Breach of Contract**
**(Against Flora and Gomez)**

25   41. Inc21 affirms and realleges the allegations set forth in paragraphs 1 through 40,

26   inclusive, of the Complaint as though fully set forth herein.

27   42. Inc21 entered into a written contract for the provision of broker services with both

28   Flora and Gomez.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

Plaintiff Inc21's First Amended Complaint for Violation of the Telemarketing and Consumer Fraud and Abuse
Prevention Act, Breach of Contract, Negligence, and Fraud; C 08-02967 WHA

43. Inc21 performed all of its required obligations under the Broker Agreement or was excused from performing its obligation due to Defendants Flora and Gomez's conduct.

44. Defendants Flora and Gomez breached the Broker Agreement by referring Inc21 to unsuitable call centers who defrauded Inc21 and by accepting commissions for fraudulently obtained sales.

45. Inc21 has been damaged as a direct and proximate result of Defendants' breaches of the contract in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
#### Negligence
#### (Against Flora and Gomez)

46. Inc21 affirms and realleges the allegations set forth in paragraphs 1 through 45, inclusive, of the Complaint as though fully set forth herein.

47. Defendants Flora and Gomez had a duty as agents to locate and refer competent and trustworthy call centers to Inc21.

48. Defendants Flora and Gomez breached their duty by referring to Inc21 the Defendant call centers.

49. Defendants Flora and Gomez received commissions on fraudulently obtained invalid sales. Inc21 has been damaged as a direct and proximate result of Defendants' negligence in an amount to be proven at trial

### FOURTH CLAIM FOR RELIEF
#### Breach of Contract
**(Against Hubbub Inc., LKU Commtech Central, I2C- Intelligence to Communicate, Inc., Intelcon Call Center, Badoles, Inc., Pelatis BPO Solutions, Prolific Contract Central, Technocall Corp., Digicall Inc., Zynergy Solutions, and Contact Central Solutions, Inc. )**

50. Inc21 affirms and realleges the allegations set forth in paragraphs 1 through 49, inclusive, of the Complaint as though fully set forth herein.

51. Inc21 entered into a written contract for the provision of telemarketing services with each defendant call center.

52. Inc21 performed all of its required obligations under the Marketing Agreement and Addendum thereto or was excused from performing its obligation due to Defendants' conduct.

53. Defendants breached the Marketing Agreements and Addendums thereto by collecting

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

Plaintiff Inc21's First Amended Complaint for Violation of the Telemarketing and Consumer Fraud and Abuse
Prevention Act, Breach of Contract, Negligence, and Fraud; C 08-02967 WHA

1    commissions on invalid sales. *See, e.g.,* Exhibit 3 at 16 ("Each party warrants and represents that

2    its activities in connection with the performance of this Agreement and all descriptions and

3    materials prepared by such Party in connection with this Agreement will comply with all

4    applicable federal, state and local laws and regulations.")

5         54. Inc21 has been damaged as a direct and proximate result of Defendants' breaches of

6    the contract in an amount to be proven at trial.

7

8    ### FIFTH CLAIM FOR RELIEF
     #### Fraud

9    **(Against Hubbub Inc., LKU Commtech Central, I2C- Intelligence to Communicate, Inc., Intelcon Call Center, Badoles, Inc., Pelatis BPO Solutions, Prolific Contract Central, Technocall Corp., Digicall Inc., Zynergy Solutions, and Contact Central Solutions, Inc.)**

10

11        55. Inc21 affirms and realleges the allegations set forth in paragraphs 1 through 54,

12   inclusive, of the Complaint as though fully set forth herein.

13        56. Defendants defrauded Inc21 by presenting to Inc21 invalid sales as valid sales and by

14   collecting commissions on those invalid sales. During June, July and August, 2007, Defendant

15   call centers used fraudulent techniques to place approximately 38,000 "sales." Defendants

16   implemented techniques, including, but not limited to, using recorded or digitized answers, to

17   thwart the TPV verification of sales and collected commissions on false sales.

18        57. The Defendants knew that recordings or digitizing answers were false and would tend

19   to mislead the TPV into verifying the sale as valid.

20        58. The Defendants intended to induce reliance because the call centers knew Inc21 would

21   pay a commission upon the verification by the TPV of a valid sale.

22        59. Inc21 justifiably relied on the call centers sale and the TPV's verification thereof and

23   paid commissions to both the brokers and the call centers.

24        60. Inc21 has been damaged as a direct and proximate result of Defendants' fraudulent

25   acts. For the call centers, the Marketing Agreement contains a $500 liquidated damages clause

26   for all fraudulently procured sales. *See* Exhibit D at 10.

27   ### PRAYER FOR RELIEF

28        WHEREFORE, Plaintiff Inc21 prays for relief as follows:

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Plaintiff Inc21's First Amended Complaint for Violation of the Telemarketing and Consumer Fraud and Abuse
Prevention Act, Breach of Contract, Negligence, and Fraud; C 08-02967 WHA

1.  Judgment against Defendants in an amount to be proven at trial;

2.  Exemplary or punitive damages according to applicable law;

3.  Attorneys' fees and costs;

4.  For such other and further relief as the Court deems just and proper

Dated: June 27, 2008                           MORGAN, LEWIS & BOCKIUS LLP
                                               BRETT M. SCHUMAN
                                               JOANNA K. SAX


                                               By _____/s/_____
                                               Joanna K. Sax
                                               Attorneys for Plaintiff
                                               Inc21.com Corporation d/b/a GlobalYP.net


## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rules of Civil Procedure Rule 38, Plaintiff Inc21 demands a jury trial.

Dated: June 27, 2008                           MORGAN, LEWIS & BOCKIUS LLP
                                               BRETT M. SCHUMAN
                                               JOANNA K. SAX


                                               By _____/s/_____
                                               Joanna K. Sax
                                               Attorneys for Plaintiff
                                               Inc21.com Corporation d/b/a GlobalYP.net

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

Plaintiff Inc21's First Amended Complaint for Violation of the Telemarketing and Consumer Fraud and Abuse
Prevention Act, Breach of Contract, Negligence, and Fraud; C 08-02967 WHA

# EXHIBIT A

**BROKER AGREEMENT**

This BROKER AGREEMENT is entered on _JULY 25, 2007_ by and between:
(Date)

Name: _MA. SHEILA P. FLORA_
Address: _3rd Floor Bermojo Bldg. McKinley st. Roxas City Capiz Philippines_
Phone: _+63917360 9443 ; +63-36-6210948_
Fax: _+63-36-6215337 ;_
Hereinafter "*BROKER*"


AND


GYP
785 Market St., Suite 900
San Francisco, CA 94103
Phone: 415.692.0541
Fax: 415.449.6261
Hereinafter "*VENDOR*"


*BROKER* and *VENDOR* hereto may be referred to singularly as "*PARTY*" or together as "*PARTIES*".

WHEREAS, *BROKER* is in the business of assisting call centers in targeting and acquiring new clients;

WHEREAS, *VENDOR* is in the business of providing one or more of the following services: Internet, telecommunications, sales, marketing or interactive services; and

WHEREAS, *BROKER* and *VENDOR* wish to enter into this BROKER AGREEMENT whereby BROKER will assist *VENDOR* in developing relationships with prospective call centers subject to the terms and conditions of this BROKER AGREEMENT.

NOW, THEREFORE, in consideration of the premises and mutual obligations and covenants contained in this BROKER AGREEMENT, the parties agree as follows:

1) **Commissions** – *VENDOR* agrees to pay *BROKER* according to the following commission schedules:
   a. GYP
      - For all referred call centers which perform the GYP program
        - Commission payments to the *BROKER* is one dollars ($1) per each approved valid sale completed by the center to which the *BROKER* represents.
        - Cancellations and charge-backs: IN the event that customer cancellations and charge-backs exceed 30% of the total otherwise valid sales generated after the 15 day trial period VENDOR reserves the right charge back any commissions paid to BROKER for each charge-back or cancellation which is over 30% of the total valid sales. Calculations of the cancellations and charge-backs are conducted per a center. Charge-backs and cancellations, which are deducted from commission payments, will be taken from both the call centers and the *BROKER*. BROKER hereby agrees that each time VENDOR charges-back for cancellations or otherwise to a call center, *BROKER* shall be

charged-back in direct proportion to what *VENDOR* charged the call center. For example, if *VENDOR* charges-back a call center that *BROKER* represents for 10 commission payments, then *BROKER* will likewise be charged-back for 10 commission payments. No failure to charge-back or vary from this practice on behalf of the *VENDOR* shall constitute a waiver of this right.

- Call Centers are paid a commission of twenty dollars ($25) for each valid sale.

b. The above commission schedules are in effect unless an alternative commission arrangement is accepted in writing by both parties.

2) **Trade Secrets and Confidentiality** – *BROKER* and *VENDOR* agree to use due diligence and best efforts to safeguard and protect from disclosure to the other parties competitors, all information provided regarding the other parties business, business strategies, marketing methods, and financial data.

3) **Non-Circumvent** – *VENDOR* agrees that information regarding prospective call centers is highly valuable and is intended for the sole use of *VENDOR* in establishing contractual agreements, which new call centers under this BROKER AGREEMENT. This information is not to be provided in any way to a third party without the permission of *BROKER*.

4) **Disclosure of Relationship** – At no time will the *VENDOR* or *BROKER* discuss the commission relationship with the call center or any 3rd party without the other parties' written approval. Commission and management negotiations will only be made by *BROKER* and the *VENDOR* and are not to be disclosed to or discussed with the call center.

5) **Reporting** – *VENDOR* agrees to provide *BROKER* with regular weekly report, as mutually agreed upon, detailing the activity for each call center referred by *BROKER*.

6) **Payments of Commission** – All payments will be made directly to *BROKER* and mailed to the address referenced on *BROKER*'s invoice to *VENDOR* each week with the appropriate backup information. Payments will be made weekly.



7) **Currency** – All payments are to be made in the United States Dollar.

8) **Term and Termination** – This agreement is for a period of one year from the date of execution of this agreement with automatic 1-year renewals unless notified by the other party that they do not wish to renew 90 days prior to the anniversary date. Either party may terminate this BROKER AGREEMENT for cause by providing 30 days written notice. *BROKER* will continue to receive commissions generated according to this BROKER AGREEMENT for as long as the *VENDOR* receives payment from the customers that were sold by *BROKER* call centers.



9) **Governing Law** – The BROKER AGREEMENT shall be governed by the laws of the State of CA, USA. All the parties agree that San Francisco County, California shall be the proper venue for any litigation.

10) **Entire Agreement** – This constitutes the entire agreement and supersedes any verbal or previous written agreements between the parties. None of the terms of this BROKER AGREEMENT shall be amended or modified except in writing and signed by both parties. If any term or provision of this BROKER AGREEMENT is deemed unenforceable by a final order of a court or competent jurisdiction, then that term of provision shall be deemed severed from the BROKER AGREEMENT as if it were never a part of hereof and the remaining terms and provision shall remain enforceable between the parties.

**IN WITNESS WHEREOF**, the parties have executed, or caused the BROKER AGREEMENT to be executed, as of the date above written.

GYP

Signature: _____

Name: _____ ROYLIN _____

Title: _____ CEO _____

Date: ___ 4/1/07 ___

Signature: _____

Name: _____ MA - STELLA FwRA _____

Title: _____ OPERATIONS MGR / PARTNER _____

Date: ___ JULY 25, 2007 ___

# EXHIBIT B

**BROKER AGREEMENT**

This BROKER AGREEMENT is entered on ___JUNE 21 , 2007___ by and between:
(Date)

Name: TRACY GOMEZ
Address: 554 ARAYAT CT. PHASE 3  COUNTRY HOMES  BRGY PUTATAN , MUNTINLUPA CITY 1770
Phone: (0922) 3384511 /(0917) 9639366
Fax:
Hereinafter "*BROKER*"

AND

GYP
785 Market St., Suite 900
San Francisco, CA 94103
Phone: 415.692.0541
Fax: 415.449.6261
Hereinafter "*VENDOR*"

*BROKER* and *VENDOR* hereto may be referred to singularly as "*PARTY*" or together as "*PARTIES*".

WHEREAS, *BROKER* is in the business of assisting call centers in targeting and acquiring new clients;

WHEREAS, *VENDOR* is in the business of providing one or more of the following services: Internet, telecommunications, sales, marketing or interactive services; and

WHEREAS, *BROKER* and *VENDOR* wish to enter into this BROKER AGREEMENT whereby BROKER will assist *VENDOR* in developing relationships with prospective call centers subject to the terms and conditions of this BROKER AGREEMENT.

NOW, THEREFORE, in consideration of the premises and mutual obligations and covenants contained in this BROKER AGREEMENT, the parties agree as follows:

1) **Commissions** – *VENDOR* agrees to pay *BROKER* according to the following commission schedules:

    a. GYP

       • For all referred call centers which perform the GYP program
          • Commission payments to the *BROKER* is one dollars ($1) per each approved valid sale completed by the center to which the *BROKER* represents.
          • Cancellations and charge-backs:  IN the event that customer cancellations and charge-backs exceed 30% of the total otherwise valid sales generated after the 15 day trial period VENDOR reserves the right charge-back any commissions paid to BROKER for each charge-back or cancellation which is over 30% of the total valid sales. Calculations of the cancellations and charge-backs are conducted per a center. Charge-backs and cancellations, which are deducted from commission payments, will be taken from both the call centers and the *BROKER*. BROKER hereby agrees that each time VENDOR charges-back for cancellations or otherwise to a call center, *BROKER* shall be



charged-back in direct proportion to what *VENDOR* charged the call center. For example, if *VENDOR* charges-back a call center that *BROKER* represents for 10 commission payments, then *BROKER* will likewise be charged-back for 10 commission payments. No failure to charge-back or vary from this practice on behalf of the *VENDOR* shall constitute a waiver of this right.

- Call Centers are paid a commission of twenty dollars ($25) for each valid sale.

b. The above commission schedules are in effect unless an alternative commission arrangement is accepted in writing by both parties.

2) **Trade Secrets and Confidentiality** – *BROKER* and *VENDOR* agree to use due diligence and best efforts to safeguard and protect from disclosure to the other parties competitors, all information provided regarding the other parties business, business strategies, marketing methods, and financial data.

3) **Non-Circumvent** – *VENDOR* agrees that information regarding prospective call centers is highly valuable and is intended for the sole use of *VENDOR* in establishing contractual agreements, which new call centers under this BROKER AGREEMENT. This information is not to be provided in any way to a third party without the permission of *BROKER*.

4) **Disclosure of Relationship** – At no time will the *VENDOR* or *BROKER* discuss the commission relationship with the call center or any 3rd party without the other parties' written approval. Commission and management negotiations will only be made by *BROKER* and the *VENDOR* and are not to be disclosed to or discussed with the call center.

5) **Reporting** – *VENDOR* agrees to provide *BROKER* with regular weekly report, as mutually agreed upon, detailing the activity for each call center referred by *BROKER*.

6) **Payments of Commission** – All payments will be made directly to *BROKER* and mailed to the address referenced on *BROKER'S* invoice to *VENDOR* each week with the appropriate backup information. Payments will be made weekly.

7) **Currency** – All payments are to be made in the United States Dollar.

8) **Term and Termination** – This agreement is for a period of one year from the date of execution of this agreement with automatic 1-year renewals unless notified by the other party that they do not wish to renew 90 days prior to the anniversary date. Either party may terminate this BROKER AGREEMENT for cause by providing 30 days written notice. *BROKER* will continue to receive commissions generated according to this BROKER AGREEMENT for as long as the *VENDOR* receives payment from the customers that were sold by *BROKER* call centers.

9) **Governing Law** – The BROKER AGREEMENT shall be governed by the laws of the State of CA, USA. All the parties agree that San Francisco County, California shall be the proper venue for any litigation.

10) **Entire Agreement** – This constitutes the entire agreement and supersedes any verbal or previous written agreements between the parties. None of the terms of this BROKER AGREEMENT shall be amended or modified except in writing and signed by both parties. If any term or provision of this BROKER AGREEMENT is deemed unenforceable by a final order of a court or competent jurisdiction, then that term or provision shall be deemed severed from the BROKER AGREEMENT as if it were never a part of hereof and the remaining terms and provision shall remain enforceable between the parties.

**IN WITNESS WHEREOF**, the parties have executed, or caused the BROKER AGREEMENT to be executed, as of the date above written.

GYP:

Signature: _____      Signature: _____

Name: _____ ROY LEE ____      Name: TRACY GOMEZ

Title: _____ CEO _____      Title: BROKER

Date: ____ 6/22/07 ____      Date: JUNE 21, 2007

# EXHIBIT C

**GlobalYP**.Net

**AGENT APPLICATION**

**General Information**

President/CEO _JENNIFER B. BENITO_    Type of Company _INTERNET CAFE_

Company Name _HUBBUB INC._

Company Address _1M ADRIATICO EXECUTIVE CENTER, 1328 M. ADRIATICO ST., MALATE, MANILA_

Company Website _www.hubbub.net_

Telephone Number (632) 7524973 (fax) 5515577    Fax Number _(632) 5515577_

Fed Tax ID _240-06-414-800_    Date _____
TIN #:

**Account Holder Information**

Name on the Bank Account _JENNIFER B. BENITO_

Account # _01-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-6_ Account Type _PRIME SAVINGS ACCOUNT_

Swift Address _MBBEPHMM_ ABA routing # _____

**Bank Information**

Bank Name _MAYBANK PHILIPPINES, INC._

Bank Address _MABINI ST., MALATE, MANILA_ Telephone # _(632) 536-0666_

**Trade References**

Company Name & Address _____

Contact _____    Telephone # _____

Company Name & Address _____

Contact _____    Telephone # _____

**Campaign History**

A _____

B _____

C _____

Please verify, modify, and make sure the information you provide are correct. Submit to: Global Yellow Pages, Sublject Agent Application, Fax: xxx xxxxxx

Note: Set up of any template will belong to the financial institution concerned and will result in modification and delayed wire transaction.

# EXHIBIT D

## Marketing Agreement

This Marketing Agreement (the "Agreement") is entered into this _14_ day of _July_, 2007, by and between Global YP, a California corporation, and _LKU COMMTECH CENTRAL_. _LKU COMMTECH CENTRAL_ shall be herein referred to as "MARKETER" and Global YP shall be herein referenced to as "PROVIDER" (collectively they shall be herein referenced to as "PARTIES"). PROVIDER is the Selling Master Agent for **Global YP.**

WHEREAS, PROVIDER offers Global YP to Businesses; and

WHEREAS, MARKETER is a marketer for one or more other service providers; and

WHEREAS, MARKETER has relationships with one or more telemarketing organizations; and

WHEREAS, PROVIDER desires that MARKETER directly produce sales by means of offering PROVIDER's services to businesses in accordance with the terms and conditions contained herein.

THEREFORE, in acknowledgement of the agreements and obligations contained herein, in exchange for valuable consideration, the PARTIES agree to be bound by the terms specified below.

### I.    DEFINITIONS

PROVIDER shall mean and include the "PROVIDER" itself, as well as its subsidiaries, affiliates, agents, representatives, assigns, or entities under its control now or in the future.

MARKETER shall mean and include the "MARKETER" itself, as well as its subsidiaries, affiliates, agents, representatives, assigns, or entities under its control now or in the future.

TELEMARKETER (S) shall mean any telemarketing organization, or organization recruited by MARKETER to market PROVIDER's services and/or products. The term TELEMARKETER shall also refer to any party, company, or otherwise that MARKETER contracts with, may hire, out or in source to, or otherwise to market PROVIDER's services and/or products. MARKETER also warrants that any and all TELEMARKETERS that it recruits, hires, or contracts with must have previous business to business web hosting and internet service and marketing experience. Further, upon written request by PROVIDER, MARKETER shall provide PROVIDER verification of such experience within ten (10) business days after receipt of such request.

Customer shall include, but is not limited to, any business that has agreed to purchase services and/or products sold by MARKETER on behalf of PROVIDER in accordance with procedures established in this Agreement.

Initial: _[signature]_

1

II.  **TERM**

  A.  The initial term of this Agreement shall be for a period of one (1) year starting on the effective date specified above. This Agreement may be terminated under the conditions set forth below under the section titled "TERMINATION OF THE AGREEMENT."

  B.  This Agreement does not automatically renew. Renewal of this Agreement for subsequent one (1) year periods shall only occur after express written authorization of PROVIDER. Written authorization of renewal of the terms of this Agreement may occur before or after a previous agreement has otherwise expired. Written authorization to renew this Agreement shall indicate the new term of the agreement, and may apply to the terms of this Agreement and its addendums, if any. If the PARTIES to this Agreement continue a business relationship after the expiration of this contract or any renewed agreement applying the terms of this Agreement, but no new agreement has been entered into concerning the term or effective dates of this or subsequent agreements, the terms of this Agreement shall govern their relationship accept for applying the one (1) year renewal period of this Agreement. All business activities between the PARTIES conducted or engaged upon outside an effective date period shall be on an "at will" basis and may be ceased at anytime. Applying a new one (1) year term to this Agreement shall only occur after express written approval by PROVIDER.

III.  **OBLIGATIONS AND RESPONSIBILITIES OF THE PARTIES**

  A.  Under this Agreement, MARKETER shall utilize only TELEMARKETERS in marketing PROVIDER's services that PROVIDER pre-approves in accordance with the terms of this Agreement. Upon PROVIDER's request MARKETER shall use and/or instruct the TELEMARKETERS it utilizes in marketing PROVIDER's services to use only marketing scripts, tactics, styles, and methods approved by PROVIDER. PROVIDER retains the unlimited right to alter, modify, approve, participate in, and provide all marketing materials, scripts, forms, methods, or tactics. All marketing practices used by MARKETER and/or the TELEMARKETERS it utilizes to market PROVIDER's services must be approved by PROVIDER. Failure to receive PROVIDER's approval of the above mentioned items may, under the discretion of PROVIDER, result in breach of or termination of this Agreement and forfeiture of any fees then owed.

  B.  MARKETER shall use customer leads (phone numbers, profiles, etc. provided by PROVIDER to solicit customers to financially commit to PROVIDER's program. Customer solicitations by agents or employees of MARKETER shall only use methods, scripts, and dialogue tactics as provided and/or approved by PROVIDER.

Initial: _____

2

C.   MARKETER shall only and exclusively utilize materials, customer leads, and sales or persuasive methods provided and/or approved by PROVIDER.

D.   <u>Keeping of Records</u>

(1)   Each call in which a customer is willing to commit, likely to commit, or shows reasonable interest in the Program Offering as set forth below, must be recorded in full from the time the customer's voice is heard until the call has ended. A customer is defined as any person that MARKETER calls or otherwise contacts or is contacted by in relation or for the purpose of making a sale or soliciting a sale or Program Offering on behalf of or for the benefit of PROVIDER. Customers are not limited to those already committed to the Program Offering, or have expressed interest in the Program Offering. Call records are not limited to initial communications with customers. Any communication or correspondence with the customers with any TELEMARKETER, employee, agent, or independent contractor working or acting on behalf of MARKETER must be recorded.

(2)   It is essential to this Agreement that MARKETER record all communications and/or correspondence with the customers, and maintain various statistical records outlined below. Hereafter, all recordings, tapes, electronic files, documents, charts, graphs, etc. of customer communication, correspondence, or statistics shall be called records. Records shall be made electronically or in any other generally accepted format for which access and maintenance is efficient and acceptable within the industry.  Phone calls shall be recorded in their entirety, and must be recorded or easily transferred into a format that PROVIDER currently has the capacity to easily and efficiently listen to and otherwise decipher clear meaning from. Written communications, if any, should be maintained in their entirety and made readily available to PROVIDER.

(3)   Each and every communication made with customers shall be recorded from the time the customer's voice or likeness is perceptible, or meaning can be deciphered from the communication. The entirety of each and every conversation must be recorded such that a reasonable person could interpret the entire interaction between the customer and the TELEMARKETER. The voices and communication of both the customer and MARKETER (agent or employee) must be recorded.

(4)   MARKETER agrees to keep and maintain Disposition Reports, which provide statistical data regarding the status of calls and customer information. Disposition Reports must be created each week and delivered to PROVIDER each week. The specific definition of Disposition Report beyond the definition as set forth in this Agreement is defined either by industry standard, or by separate oral or written instructions provided to MARKETER by PROVIDER.  Reasonableness and good faith must be maintained at all times in the delivery and maintenance of Disposition

Initial: _____ , _____

3

Reports.

Disposition Reports must be created and sent to PROVIDER each week. The purpose of a Disposition Report is to communicate the status of each lead that has been provided to MARKETER. The format and contents of the Disposition Reports must conform to the specific requirements as set forth by PROVIDER. The creation and delivery of Disposition Reports is essential in order for PROVIDER to provide MARKETER with new leads. No new leads shall be provided to MARKETER unless the Disposition Report for the prior two (2) weeks has been sent to PROVIDER. For example, new leads for the third week in January shall not be provided to MARKETER until the Disposition Reports for the first week in January have been successfully delivered and received by PROVIDER.

(5)   All records of customer communication or correspondence, and call statistics records shall hereby be deemed the property of PROVIDER and will be kept and maintained by MARKETER. Thus, no such records may be used for any purpose that is not specified in this Agreement. Under no circumstances may MARKETER use the information for other means or provide such information to any third party. If MARKETER misuses any such information it shall be assessed a two hundred dollars ($200.00) liquidated damages fee. In addition, PROVIDER reserves the right to pursue any other applicable claims it may have against MARKETER for such misuse of information. All records must be maintained and kept in perpetuity. No records may be destroyed without express written authorization by PROVIDER. Upon request all records must be made available to PROVIDER for any reason. Records must be delivered in a reasonable manner to PROVIDER within five (5) business days after notice has been given to MARKETER that PROVIDER wishes to obtain any and all records. Notice to MARKETER of a request of records, reports, or recording shall be in the form of at least an e-mail or facsimile (fax), but are not limited to only these mediums. A reasonable manner of providing the records to PROVIDER, is sending the records either my mail, shipment, or electronically to PROVIDER's location(s) of choice. Under no circumstance shall PROVIDER be required to travel in excess of ten (10) miles in order to receive any such shipment or electronic transmission from MARKETER. All costs, fees, and time incurred in sending, transmitting, or accessing the records shall be borne by MARKETER exclusively.

E.   After customers have committed to the Program Offering, MARKETER must report such sales or commitments to PROVIDER as set forth below.

F.   In exchange for successful sales made by MARKETER, PROVIDER agrees to compensate and/or pay a commission to MARKETER for each valid/successful sale. The terms of payment, commission, and valid/successful sales are outlined below.

Initial: _____

4

G.    Sales or commitments whereby the customer later denies knowledge of the sale, interaction, or commitment to the Program Offering are not considered valid or successful sales. The specific terms regarding customer cancellations are outlined below.

H.    PROVIDER may levy fees, deductions, or other types of costs against MARKETER as provided for in this Agreement.

I.    (1)    PROVIDER shall have exclusive control and approval of all materials, customer lists, customer profiles, telephone communication scripts, sales methods, sales styles, and customer relation policies. Thereby, PROVIDER retains the right to control and approve each of the above mentioned items for any purpose used by MARKETER to solicit or make sales with or to customers. Any ambiguity or lack of clarity on whether PROVIDER's approval exists, or if there is a lack of information or materials needed to complete, engage, or modify sales or solicitation tactics must be communicated to PROVIDER for assistance or approval. All communications with PROVIDER must be sent in a reasonable time to PROVIDER at the address, email(s), or telephone number(s) set forth below in this Agreement. PROVIDER shall make all reasonable efforts to provide affirmation, confirmation or materials to MARKETER after being notified successfully by MARKETER. No action by MARKETER may take place without such approval or confirmation by PROVIDER. Any actions taken on behalf of PROVIDER by MARKETER without compliance with the above requirements may not yield a successful or valid sale under this Agreement.

(2)    No information or solicitation may be delivered to the customers without express approval by PROVIDER. This is to protect against "up selling," which is the practice of including other solicitations in the same call or contact to the customer. Each contact with the customer by MARKETER, its subsidiaries, affiliates, agents, representatives, assigns, entities, or TELEMARKETERS, may only include information or a solicitation of the Program Offering provided by the PROVIDER which is mentioned and/or detailed within this Agreement.

## IV.    PROVIDER'S PROGRAM OFFERING

The Program Offering mentioned in this Agreement is to be separately provided to MARKETER. PROVIDER may alter and/or modify the Program Offering from time to time at its sole discretion. MARKETER agrees to be familiar with PROVIDER's current Program Offerings and must relay the information accurately and completely to the customer.

Project Offering of this Agreement: Global YP

Initial: _____ / _____

5

**V.    VALID/SUCCESSFUL SALE REQUIREMENTS**

PROVIDER will only pay MARKETER commissions for valid/successful sales. The term "valid" or "successful" in connection with the term "sale" are used synonymously for the purposes of this Agreement and have the same meaning whether used together, or separately. A sale is not considered valid/successful if it does not satisfy the complete terms of this Agreement. Common factors which may invalidate a sale are:

a)    The customer does not agree to each of the terms of PROVIDER's Program Offering,

b)    The customer cannot be billed via a LEC,

c)    The call and/or call recording is not verified by PROVIDER's Quality Control Department (QCD) and a complete record of the entire sequence of phone communication(s) is not provided or made available to PROVIDER,

d)    And the phone number(s) used are not included in the applicable Disposition Report for the time period.

The above factors are merely some of the factors in establishing a valid/successful sale, but the requirements for a valid sale are not limited to these requirements. A valid/successful sale must comply with each of the requirements in this Agreement.

Valid sales are defined as sales that have been verified by PROVIDER's Quality Control Department (QCD). PROVIDER maintains or has relationships with various Quality Control Departments who must make an evaluation of the data and voice recording before a sale is deemed to be valid or successful for the purposes of payments of commissions. All sales must be verified by PROVIDER's QCD to be valid. Communications and voice recordings are to be delivered within thirty six (36) hours to PROVIDER's QCD after the call has ended. The QCD will only validate sales where there is not only an affirmative intent to commit to the Program Offering, but also a clear verbal "Yes" confirmation by the customer that they agree to the Program Offering. If there is any reasonable question as to the intent of the customer in committing to the charges or the Program Offering, such intent shall be evaluated in an objective, subjective, and good faith manner by a neutral, detached, third party located in the State of California, United States of America. The verbal confirmation must be recognizable without any interruptions by a TELEMARKETER or any outside disturbance; including audio interference resulting in inaudible and/or poor quality during the voice recording. A full sales recording (not just Third Party Verification recording, but also a recording of all of the initial communications with customer(s)) from beginning to end of the sale must be made available at PROVIDER's request. All recordings must be kept and maintained indefinitely, unless PROVIDER expressly consents in writing otherwise. Unless otherwise agreed in writing by the PARTIES, all audio recordings must be in the "VOX" format when delivered to PROVIDER. Any manipulation of voice recordings will result in an automatic assessment of five hundred dollars ($500.00) in liquidated damages, which will be deducted from commissions owed to the MARKETER. The recordings must be complete in length as described above, and must utilize the script provided to MARKETER by PROVIDER. Valid sales may not include sales that have been closed via unauthorized individuals who are not within the position

Initial: _____ / _____

6

to dictate decisions on behalf of MARKETER. Valid sales further may not include individuals who are not in a direct or representative capacity to make decisions on behalf of the customer. This specifically excludes minors (individuals under 18 years of age), customers who have subsequently cancelled, rejected, or rescinded their commitment to the Program Offering, existing customers, and employees, relatives, or other people who answer the solicitation who have no legal authority, either express or implied to enter into any agreement or contract on behalf of the customer whom MARKETER was trying to initially reach.

A sale is invalid if the phone number used/contacted to make that sale is not included in the Disposition Report for the time period in which the sale was made, and that Disposition Report is not delivered to PROVIDER. Each phone number used to make an otherwise valid/successful sale must be included in a Disposition Report which is delivered to PROVIDER in order to be considered valid/successful by PROVIDER.

Under no circumstances may MARKETER, its TELEMARKETERS, employees, assigns, business partners, agents, or any entity doing business on behalf of, or for MARKETER be engaged in the practice of "cramming" or "slamming." The controlling definition of these terms shall be that definition that the United States Federal Communication Commission (FCC) provides at the time of the signing of this Agreement. Those terms are loosely defined, but not limited to, the following definitions:

"Cramming" is the practice of placing unauthorized, misleading, or deceptive charges on a consumer's telephone bill.

"Slamming" is the illegal practice of changing a consumer's telephone bill without permission.

Any and all otherwise valid/successful sales which are procured by cramming or slamming will not be considered a valid or successful sale under this Agreement. Further, MARKETER agrees to be held liable in the United States, in any applicable district, for any illegal or tortious practices that it has engaged in for which PROVIDER is found liable.

## VI.    LEADS

The term "lead(s)" in this Agreement refers to customer or potential customer information, phone numbers, addresses, and/or profiles that are, have been, or shall be provided to MARKETER by PROVIDER. Only MARKETER and those it has authorized shall to use the leads provided by PROVIDER to contact customers for the benefit and only for the benefit of PROVIDER. Leads provided to MARKETER shall only be used for the purposes of contacting customers in connection with the solicitation of the Program Offering specifically detailed and mentioned in this Agreement. Leads may not be used for any other purposes whatsoever by MARKETER, its TELEMARKETERS, agents, assigns, partners, customers, subsidiaries, or anyone else other than PROVIDER. All leads are the sole property of PROVIDER. The leads that PROVIDER

Initial: _____

7.

discloses to MARKETER are to be used solely for the benefit of PROVIDER. If there is any a question as to the ownership of the leads, PROVIDER shall always have a superior ownership interest in the leads over any claim to ownership of such leads by MARKETER. Any misuse of leads by MARKETER shall constitute a material breach of this Agreement and constitute a waiver of any or all of MARKETER's commissions as detailed above.

All leads used by MARKETER must be "fresh." Fresh leads are defined as leads that have been provided to MARKETER by PROVIDER no more than thirty (30) days prior to usage. The ability of a lead to be used by MARKETER expires thirty (30) days after those leads or lead has been sent to MARKETER. Any or all sales made using leads that are no longer "fresh," are not considered valid or successful sales for the purposes of this Agreement.

To receive new leads, MARKETER must comply with the Disposition Report requirement as set forth in this Agreement. Further, MARKETER hereby agrees that if it cannot produce at least one hundred and thirty (130) valid/successful sales per ten thousand (10,000) leads provided to it by PROVIDER, PROVIDER has the right to assess against MARKETER any or all of the costs PROVIDER incurred as a result of those leads. This subject is further described in the section covering payment terms, costs, and fees.

## VII. VALIDATION TOOLS

Live validation tools when and if provided by PROVIDER shall only be used to validate sales for PROVIDER's Program Offering. PROVIDER retains sole ownership of all validation tools in whatever form they may be, and merely permits MARKETER to use those tools for the sole purpose expressed upon delivery of those tools.

## VIII. PAYMENT TERMS, COSTS, AND FEES

PROVIDER shall only pay commission on seventy percent (70%) of the total valid/successful sales. Under no circumstances shall PROVIDER pay commissions on more than seventy percent (70%) of the total valid/successful sales. Commission shall be at a rate of twenty five dollars ($25.00) for each of the valid/successful sales after the above thirty percent (30%) has been subtracted. For example, if one hundred (100) valid/successful sales have been made, a commission of twenty five dollars ($25.00) shall be made on seventy (70) of the one hundred (100) valid/successful sales. The total commission for one hundred (100) valid/successful sales shall be seventeen hundred and fifty dollars ($1,750.00) (100-30% = 70 x 25.00 = $1,750.00). Commissions shall only be paid for sales that are specifically identified as valid/successful sales under the terms of this Agreement. Additionally to only paying commission on seventy percent (70%) of the valid/successful sales, other costs, fees, and deductions may apply under various circumstances as specified below. Specific payment terms are as follows:

Initial: _____ / _____

8

(a)    All monetary figures within this Agreement are expressed in United States Dollars. Further, all fees, costs, commissions, and payments made to either Party to this Agreement shall be in the form of United States Dollars. If there is ever a question of currency conversion rates, the rate of conversion shall be determined at the earliest possible date that payment, costs, commissions, or fees are due.

(b)    Payments shall be made on a weekly basis, save for the first payment which shall be made two (2) weeks after the first Friday that MARKETER has begun selling, soliciting, or otherwise providing services for PROVIDER. Thereafter, payments shall be made weekly each Friday via direct wire transfer to a source of MARKETER's choosing as long as that source does not create unreasonable costs or inconvenience for PROVIDER in wiring the money. Invoices to MARKETER must be a minimum of one thousand dollars ($1,000.00) for a direct wire transfer. If the weekly payment to MARKETER is under the minimum of one thousand dollars ($1,000.00), MARKETER has the choice of either adding that amount to the next week's payments due, or may deduct a fee of forty five dollars ($45.00) from the amount due to cover the costs of wiring funds of under one thousand dollars ($1,000.00) for that week's payment. Under any circumstance that PROVIDER wires to MARKETER any amount under one thousand ($1,000.00), a forty five dollars ($45.00) fee shall always apply.

(c)    In order to protect from overly aggressive and/or fraudulent sales or sales tactics, customer cancellations after the first fifteen (15) days of service but before thirty (30) days, circumstances where the sale was accomplished via an unauthorized party, and "cramming" or "slamming" as defined in this Agreement and clarified by the American Federal Communications Commission (FCC), but not limited to the above mentioned circumstances, PROVIDER reserves the right to withhold commission payments to MARKETER (as described below) if thirty percent (30%) or more of MARKETER's otherwise valid/successful sales for the week have been canceled or are not able to be completed for any of the above reasons or any other reason after the fifteen (15) day trial period which is provided to the customer per the Program Offering as provided by PROVIDER. If the cancellations or the number of un-billable customers exceeds thirty percent (30%) of the total otherwise valid/successful sales for that billing period, then PROVIDER may apply a deduction, in the amount of twenty five dollars ($25.00) per customer cancellation or un-billable customers whom is above thirty percent (30%) of the total customer cancellations or un-billable customers for that time period. For example, if during an applicable time period, there are thirty five (35) customer cancellations or un-billable customers out of a total one hundred (100) otherwise valid/successful sales, then the total percentage of customer cancellation or un-billable customers is thirty five (35%). Because that amount is in excess of thirty percent (30%), the difference of five percent (5%), five (5) customers in this circumstance will be charged against MARKETER in the amount of twenty five dollars ($25.00), that shall be deducted for each of the five (5) customers. Therefore, the amount deducted/charged against MARKETER in

Initial: _____

9

this circumstance shall be one hundred and twenty five ($125.00) ($25.00 x 5 = $125.00).

(d)    In addition to the above mentioned terms on "cramming", PROVIDER reserves the right to assess one hundred and fifty dollars ($150.00) in the form of liquidated damages against MARKETER if PROVIDER receives "cramming" complaints from any LEC. These liquidated damages apply for each "cramming" complaint received and shall be accompanied by proof of the complaint in the form of the letter or communication sent from the LEC to PROVIDER.

(e)    MARKETER is entitled to bonus commission payments under certain circumstances. An additional two dollars ($2.00) is added per approved sale, as bonus, for each valid/successful sale which yields a customer who is still an active paying customer of PROVIDER, three (3) months after the initial billing date. Each period is calculated on a monthly basis, and not a weekly basis. This bonus payment is subject to the following conditions:

   1.    *Sales that are still "active" means that the customers have not cancelled the services provided by PROVIDER, and have paid each bill in full up to that three (3) month mark for the purposes of this calculation. Bonuses will be calculated and paid after the completion of the third monthly billing cycle, this will occur on the fourth month after the valid/successful sale was made. For example, the bonus for sales made in the month of January will be paid the first week of May.*

   2.    *Weekly cancellations and un-billable customers that do not exceed thirty percent (30%) during the time period between when the sale was made, and the time when the bonus commission would otherwise be due.*

(f)    All sales orders and TPV reports/recordings must be submitted no later than 11:59 p.m. Pacific Standard Time (PST) for the sales to be included in the week's invoice. For example, if MARKETER submits sale reports and TPV reports after 11:59 p.m. PST on the Friday of that week's sales, those sales will not be included in the week's sales and will be added to the following week's sales invoice. All sales should be submitted daily, but if this cannot be done due to extenuating circumstances sales must be submitted by 11:59 p.m. PST on the Friday of relevant week.

(g)    All fraudulent sales found, which are proven by the customers and/or the PROVIDER's QCD, are grounds for five hundred dollars ($500.00) liquidated damages assessment against MARKETER for each fraudulent claim, which will be deducted from the weekly commissions. Such liquidated damages do not function as a punishment to MARKETER, but merely cover some of the costs associated with consequences that fraudulent sales have upon PROVIDER. PROVIDER also reserves the right to seek prosecution and/or tortious claims of

Initial: _____ / _____

10

the individual(s) or PARTIES involved in the fraudulent activity mentioned above.

(h)     PROVIDER provides leads for particular purposes and subject to these terms and the terms above in the section detailing leads. PROVIDER reserves the right to charge MARKETER for the cost of leads and/or the withholding of commissions due, if any leads provided by PROVIDER are found to be affiliated, reserved, or used with other campaigns either related to PROVIDER or not. Further, PROVIDER expects a minimum of one hundred and thirty (130) valid/successful sales for every ten thousand (10,000) leads provided to MARKETER (60 sales for every 5,000 leads list). If this requirement is not fulfilled, PROVIDER reserves the right to charge MARKETER the amount which the leads provided to them cost PROVIDER as a remedy for breach of this term.

(i)     WEEKLY SALES QUOTA REQUIREMENT. MARKETER is required to meet a minimum weekly sales quota of at least 250 valid sales per each 5 day business week. Only valid sales as defined in this agreement may apply to weekly sales requirements. In the event that MARKETER fails to reach the weekly sales quota for any given week after 60 days, PROVIDER, at PROVIDER's sole discretion, may lower the total commissions due to MARKETER from twenty five dollars ($25.00) per a sale, to twenty two dollars ($22.00) per a sale for each valid sale that week.

(j)     *PROVIDER shall be the final interpreter of fees, commissions, and bonuses that are due to MARKETER. All invoices, reports, and statements that MARKETER may deliver or send to PROVIDER are not to be considered a final measure or determination of money owed or due. Payments to MARKETER shall be calculated by PROVIDER only, and any invoices sent to PROVIDER shall be considered merely an indication of intent to be paid, but not necessarily in the amount shown on the invoice created by MARKETER.*

## IX.     DILIGENCE IN PERFORMANCE OF THIS AGREEMENT

MARKETER hereby agrees to pursue all customer leads with reasonable diligence and in good faith. Customer leads include phone numbers, contact information, or otherwise that PROVIDER provides to MARKETER in order to contact customers. MARKETER further agrees to employ good faith and fair dealing in the compliance, execution, and carrying out of each and every part of this Agreement.

## X.     REPORTING

Various types of reports must be made, or made available to PROVIDER, and shall be considered a material element to this Agreement. The specific detailed requirements on each type of reporting requirement is detailed in other parts of this Agreement.

Initial: _____

· 11

On a weekly basis, PROVIDER shall furnish MARKETER with a "Sales Report" of validated as well as invalidated sales. The "Sales Report" is not to necessarily be considered a final report and may be subject to subsequent modification, alteration, or restatement. MARKETER hereby agrees not to interpret or use weekly sales reports as a final indication of the commission or fees that are owed in conjunction with MARKETER's services. MARKETER must also furnish daily Third Party Verification (TPV) reports and recordings that are to accompany the daily sales orders. Further, Disposition Reports must be delivered subject to the terms set forth above in order for MARKETER to receive new leads. Lastly, full voice recordings, as set forth above must be available to PROVIDER for sales to be valid.

XI.    **NON-DISCLOSURES AND CONFIDENTIALITY**

A.    All customer lists and all information disclosed by PROVIDER to MARKETER and any TELEMARKETER that MARKETER utilizes in marketing PROVIDER's services, whether orally or in writing, which pertains to present or future pricing, discount policy, marketing strategies, commission plans, business plans, customer lists, customer information, or sales goals, is hereby identified and acknowledged as proprietary and confidential (hereinafter "Proprietary Information"). The PARTIES shall, and agree to require individuals within their organizations to treat all Proprietary Information in a confidential manner, and, except to the extent necessary for the performance of its obligations under this Agreement, not to directly or indirectly disclose the Proprietary Information to any third party without the prior written consent of PROVIDER, or to use any such Proprietary Information for the private gain of the Receiving Party for profit or competition purposes.

Any Information that is furnished or made available or otherwise disclosed to MARKETER and any TELEMARKETER that MARKETER utilizes in marketing PROVIDER's services pursuant to this Agreement shall be Proprietary Information and the sole property of PROVIDER.

B.    The PARTIES further agree that at PROVIDER's request, MARKETER or receiving party shall obtain a Non-Disclosure and Confidentiality Agreement, which addresses the matters set forth in this Article. The provisions of this Non-Disclosure and Confidentiality section shall remain in effect after the termination of this Agreement between MARKETER and PROVIDER.

XII.    **NON-INTERFERENCE**

Each of the PARTIES to this Agreement agree not to interfere, disrupt, circumvent, or terminate any existing or future business relationships or otherwise that the PARTIES to this Agreement may have. The PARTIES further agree to apply the above mentioned prohibited activities to any employee, agent, subsidiary, assign, or representative of the

Initial: _____

12

other Party.

### XIII.  LIMITATION OF LIABILITY AND INDEMNIFICATION

MARKETER agrees to indemnify PROVIDER for any and all claims made by any and all third persons or entities against PROVIDER that are based upon MARKETER's performance of or failure to perform its duties and obligations within this Agreement.

### XIV.  RELATIONSHIP BETWEEN MARKETER AND PROVIDER

MARKETER and PROVIDER acknowledge their independent relationship and agree that the relationship between them is solely that of independent contractors and that nothing herein shall be construed to constitute a different relationship between them, such as that of employer/employee, agent/principal, partners, joint ventures, co-owners, or otherwise as participants in a joint or common undertaking. Employees of one (1) party shall not be entitled to benefits of any nature whatsoever provided by the other Party to its employees. Neither PROVIDER nor MARKETER (or their respective agents, employees, or representatives) shall have any right, power or authority to create any obligation, express or implied, on behalf of the other.

Neither Party shall have the right to enter into any contract or agreement on behalf of the other Party. Without limiting the generality of the foregoing, PROVIDER shall not sign any contract on behalf of MARKETER, or accept any payment from any third party that owes any obligation(s) to MARKETER, and shall not make any representation, guarantee, condition, or warranty unless it is expressly authorized in writing by MARKETER.

### XV.  OWNERSHIP OF INTELLECTUAL PROPERTY

PROVIDER retains all intellectual property rights in any materials either written or oral that it provides to MARKETER, or that MARKETER learns during the course of the relationship between the PARTIES. All materials or information either covered or not covered by the confidentiality clause to this Agreement shall be the sole property of PROVIDER. MARKETER may not use any materials or information provided to them by PROVIDER for any use not expressly authorized by PROVIDER. Violation of these terms may subject MARKETER to state and/or Federal copyright, trademark, or patent law whose scope are outside the language of this Agreement.

### XVI.  TERMINATION OF THIS AGREEMENT

Either Party may terminate this Agreement upon ten (10) days written notice to the other Party. This Agreement is also terminable immediately if MARKETER is not in compliance with the terms of this Agreement or is in breach of any of the terms of this

Initial:

13

Agreement. PROVIDER retains the discretion at all times to determine if MARKETER's conduct constitutes breach of this Agreement. Termination of this Agreement shall not modify or terminate PROVIDER's obligation to pay commissions due, nor shall it remove the applicability of any of the terms of this Agreement to prior or existing relations or business between the PARTIES, nor shall it remove any duties or obligations that MARKETER has to PROVIDER.

## XVII.  FORFEITURE OF FEES AND/OR COMMISSIONS

Under its sole discretion, PROVIDER may exercise a contractual right, set forth by this Agreement, not to pay fees, costs, or commissions otherwise due to MARKETER, as a remedy for breach, failure to perform obligation, or non-compliance with the terms of any part of this Agreement. Breach shall include, but is not limited to; noncompliance of the terms, intentional oversight of any of the terms, clauses, or responsibilities of this Agreement, or a failure to report the necessary information to PROVIDER as set forth in this Agreement. Breach as defined in this Agreement, but not limited to such definition shall have the effect of a waiver or forfeiture of any or all commissions, fees, costs, or money, or services otherwise due to MARKETER under this Agreement. Strict compliance with the terms set forth above and below are material and necessary to compliance with the responsibilities set forth under this Agreement. Both MARKETER and PROVIDER shall each have an opportunity to remedy breach or noncompliance as set forth below.

## XVIII.  FORCE MAJEURE

Both PARTIES shall not be liable for, and are excused from, any failure to perform or for delay in the performance of its obligations under this Agreement due to causes beyond its reasonable control, including without limitation, acts of nature, governmental actions, fire, flood, or natural disaster.

## XIX.  ASSIGNMENT

Neither this Agreement nor any rights or obligations hereunder may be assigned or otherwise transferred by either Party to any assignee, agent, corporation, or entity without the prior written consent of the other Party.

## XX.  NOTICES

Any notices, requests, or demands that are required to be given pursuant to or in connection with this Agreement shall be in writing, sent via certified mail and/or facsimile.

Initial: _____

14

Notices to MARKETER shall be sent to the following address:

_Lieu   animaTECH CENTRAL_
_Door #4  No.1 Benediction St._
_JARO , ILOILO CITY_
_PHILIPPINES_

Attn: _ANN MARCIA LOU M. UY_
Telephone Number: _+6333-3000487_
Facsimile Number: _____

Notices to PROVIDER shall be sent to the following address:

___217 Laussat St. _____
___San Francisco, CA 94117 _____

Attn: ___Roy Lin _____
Telephone Number: _415.692.0541__
Facsimile Number: __415.449.6261__

## XXI.  COMPLIANCE AND REMEDIES TO BREACH

A.  Strict compliance by MARKETER with the terms, conditions, requirements, and duties set forth in this Agreement.  Failure to comply with the requirements of this Agreement shall relieve the other Party from having to perform its duties and obligations specified in this Agreement in part or in full.

B.  Each party shall have the opportunity to remedy breach or noncompliance of this Agreement. Remedy shall include, but is not limited to, successful and strict compliance with the terms of this Agreement whereby such compliance still satisfies the purpose(s) of this Agreement. Before given the opportunity to remedy, the breaching party must be given notice of the breach. Notice shall be sent to the PARTIES at the above mentioned addresses. Notice may be made my mail, phone, in person, electronically, or any other generally accepted means of communication between the PARTIES that is reasonably meant to confer notice. Each party shall have tem (10) business days in which to remedy breach. After this period has ended without the breaching party remedying the breach, no notice thereafter must be given to pursue means of collecting damages or exercising any of the rights set forth in this Agreement.

Initial: _____

15

## XXII. COUNTERPARTS

This Agreement may be signed in any number of counterparts with the same effect as if the signature on each such counterpart were on the same instrument.

## XXIII. SEVERABILITY

In the event that one or more of the provisions or terms contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality, and enforceability of the remaining provisions will not in any way be affected or impaired. Any illegal or unenforceable term shall be deemed to be void and of no force and effect only to the minimum extent necessary to bring such term within the provisions of applicable law and such term, as so modified, and the balance of this Agreement shall then be fully enforceable.

## XXIV. CHOICE OF LAW AND VENUE

The PARTIES to this Agreement hereby submit and agree to be governed by the law of the State of California in the United State of America. If a Party brings an action against the other in a California State Court then such action must be brought or filed in San Francisco County. If a Party brings an action against the other in Federal Court then the action must be brought/filed in the United States District Court of Northern California. The PARTIES to this Agreement further understand that they may be subject to both State and Federal law.

## XXV. WARRANTIES

Each Party warrants and represents that its activities in connection with the performance of this Agreement and all descriptions and materials prepared by such Party in connection with this Agreement will comply with all applicable federal, state and local laws and regulations. PROVIDER agrees to comply with all applicable telemarketing registration and "Do Not Call" requirements in respect to leads provided to MARKETER. MARKETER further warrants that it or their business partners maintain generally accepted business practices and facilities for the purposes of their duties under this Agreement. MARKERTER warrants that it has the skill, experience, and resources available to perform its duties and obligations under this Agreement, and that it complies with generally accepted industry standards in its location or locations.

Each Party to this Agreement further warrants that they have the present ability, capacity, sophistication, and technology to comply with the terms of each part of this Agreement.

Initial: _____

16

## XXVI. NON-WAIVER

Except as otherwise indicated above under the section titled "Forfeiture of Fees and/or Commissions," no failure of a Party to exercise any right given it hereunder, or to insist upon strict compliance by the other Party with any obligation hereunder, and no customer practice of the PARTIES at variance with the terms hereof shall constitute a waiver of such PARTIES' rights to demand exact compliance with the terms hereof. Waiver by a Party of any particular default by the other Party shall not affect or impact such party's rights in respect to any subsequent default of the same or of a different nature, nor shall any delay or omission of such party to exercise any rights arising from such default affect or impair such party's rights as to such default or any subsequent default. PROVIDER further retains and reserves all rights in this Agreement, and the ability and right to enforce the rights in this Agreement regardless of whether PROVIDER has or has not exercised those rights in the past. The defense of laches shall not be available and is hereby waived by MARKETER under any circumstances whereby PROVIDER asserts or enforces previously unexercised or loosely exercised rights contained within this Agreement.

## XXVII. INTERPRETATION

Should a dispute arise regarding the meaning, construction or interpretation of this Agreement, or any part thereof, this Agreement shall be construed with the understanding that all PARTIES have actively participated in its negotiation and drafting, and no presumption shall be employed by any court or other party construing the Agreement against any party due to its playing the primary role in the drafting of this Agreement. Each party is hereby advised to review this Agreement with an attorney before signing in order to fully understand the terms and conditions of this Agreement. Signature of this Agreement functions as an affirmation that the Party is clear on the terms of the agreement and submits to the entire Agreement.

Initial: _____

17

## XXVIII.  ENTIRE AGREEMENT

This Agreement constitutes the entire and final agreement between the PARTIES with respect to the subject matter hereof and referenced herein, and supersedes and terminates any prior agreements between the PARTIES (written or oral) with respect to the subject matter hereof. This Agreement may not be altered or amended except by written authorization signed by both PARTIES.

IN WITNESS WHEREOF, this Agreement is hereby executed, along with any attached documents, addendums, or exhibits, effective the date first designated herein.  By signing this Agreement each Party warrants a full understanding of it and agrees with each of its terms as set forth above.

Global YP

DATE: ___7/25/07___

ROY LIN, CHIEF EXECUTIVE
OFFICER OF INC21
COMMUNICATIONS, INC.

DATE: ___July 14, 2007___

[INSER MARKETER NAME]
LKU COMMTECH CENTRAL
ANN MARCIA LOU M. UY
[INSER NAME] AUTHORIZED
REPRESENTATIVE OF [INSERT
NAME HERE]

Initial: _____

18

# EXHIBIT E

 **GlobalYP.**Net

## Addendum to Marketing Agreement (INSERT ADDENDUM NUMBER)

In consideration for continued participation in the ___Global YP___ Campaign, this amendment adds terms to the original MARKETER AGREEMENT signed between _____("PROVIDER") and _i2c_____ ("MARKETER") on _July 30, 2007_(DATE). This amendment shall become effective from the date of signature below.

WHEREAS, MARKETER may have provided Third Party Verification (TPV) services in the past or currently, PROVIDER now requires TPV reporting to be conducted by a separate company (Voicelog) applicable to all sales calls. For continued participation in PROVIDER'S campaign(s), MARKETER must agree to comply with the new terms and procedures as set forth below, and any subsequent procedural documentation or policies, and rules which do not conflict with this agreement.

Added Language as Follows:

### Third Party Verification Terms and Procedures

Due to United States Federal Regulations as set forth by the Federal Trade Commission (FTC) and any other applicable law makers, PROVIDER must comply with specific TPV reporting requirements. In order to better effectuate such compliance, PROVIDER requires a true third party TPV service provider, set apart from MARKETER. Failure to conform to these rules and procedures is a material breach of this agreement, will subject MARKETER to no commission for any applicable customers, and may result in charge-backs to MARKETER for fees incurred to PROVIDER.

The specific TPV service provider shall be Voicelog, LLC.

MARKETER shall comply with all rules and procedures set forth by PROVIDER and Voicelog. If there are any conflicts between the rules and procedures set forth by PROVIDER and Voicelog, MARKETER must consult with PROVIDER to clarify such issues, and the rules and procedures set forth by PROVIDER shall be controlling to MARKETER.

It is intended that TPV reporting be commenced immediately after the potential customer has agreed to be interested and/or sign up for the service which is the subject of the campaign. MARKETER representative shall follow all applicable rules and procedures in transferring or connecting with TPV service provider. Further, MARKETER must maintain the proper technology and/or means to interface and/or connect with the TPV service provider.

Additionally to any other applicable rules, MARKETER representative SHALL NOT, speak during the TPV recording, unless the potential customer specifically asks MARKETER representative a direct question. MARKETER representative may then clearly and succinctly



respond to said questions, and then remain silent once again. Only before the TPV process has begun, may MARKETER representative inform the potential customer that they may ask questions during the TPV process to MARKETER representative. It is further intended that if MARKETER representative listens-in on the TPV recording, they remain completely silent and not hinder the TPV process. Only the potential customer may answer or respond to TPV questions or inquiries. Any breach of these terms will result in a failed sale, no commissionable event for MARKETER, and possible a charge-back to MARKETER of fees incured to PROVIDER.

PROVIDER will only pay for a maximum of two (2) TPV attempts. If TPV is necessary after the second attempt, then MARKETER is liable for the costs of the TPV which will be effectuated by a charge-back to MARKETER by PROVIDER.

*End of Added Language in this Amendment*

By signing this document, the parties have read and understand the amended language. Before signing this agreement the parties have answered all questions and fully understand the implications of this amendment to the original MARKETER AGREEMENT as signed between the parties. Signature by the parties below confirms full agreement to the terms of this amendment as added to the original agreement signed between the parties.

DATE: _____ 08/07/07 _____        (CAMPAIGN/PROVIDER NAME)

ROY LIN, CHIEF EXECUTIVE
OFFICER OF INC21
COMMUNICATIONS, INC.

DATE: _____

IRe Intelligence & Communicate
[INSER MARKETER NAME]

SAMADETH Fi SERVITO - General Mana
[INSER NAME] AUTHORIZED
REPRESENTATIVE OF [INSERT
NAME HERE]