IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

INC21.COM CORPORATION
d/b/a GLOBAL YP.NET

    Plaintiff,

  v.

MA SHEILA FLORA, TRACY GOMEZ, HUBBUB INC., LKU COMMTECH CENTRAL, 12C-INTELLIGENCE TO COMMUNICATE, INC., INTELCON CALL CENTER, BADOLES, INC., PELAMIS BPO SOLUTIONS, PROLIFIC CONTRACT CENTRAL, TECHNO CALL CORP., DIGICALL INC., SYNERGY SOLUTIONS, and CONTACT CENTRAL SOLUTIONS, INC.,

    Defendants.
                                                 /

No. C 08-02967 WHA

**ORDER GRANTING PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT**

**INTRODUCTION**

    In this contract dispute, plaintiff Inc21.com Corporation d/b/a GlobalYP.net moves for entry of default judgment against all defendants. Default was entered more than two months ago against defendants, none of whom have filed responsive pleadings or otherwise appeared in this action. This order finds that plaintiff has met its burden in establishing sufficient personal jurisdiction over defendants and that service of defendants was proper. This order further finds that review of the *Eitel* factors favors entry of default judgment. Accordingly, plaintiff's motion for default judgment is **GRANTED**. Plaintiff asks for damages totaling

1  $9,879,718 ranging from a low of $274,500 to a high of $1,887,000 against the respective
2  thirteen defendants. Plaintiff is awarded damages totaling $2,813,823 ranging from a low of
3  $14,000 to a high of $637,500 against the respective thirteen defendants.

**STATEMENT**

Plaintiff is a California corporation with its principal place of business in San Francisco, California. Defendants Ma Sheila Flora and Tracy Gomez are alleged individuals and residents of the Philippines. The remaining defendants are each alleged entities located, with their headquarters and principal place of business, in the Philippines (First Amd. Compl. ¶¶ 1–14).

This action concerns agreements for defendants to provide booking and telemarketing services to plaintiff. The action was commenced on June 16, 2008. Plaintiff filed a first amended complaint on June 27 containing the following allegations.

Plaintiff is a provider of internet-based services for small businesses including, among other things, maintaining internet yellow pages. Plaintiff contracts with brokers to locate call centers to contact potential subscribers via telephone to sell subscriptions to its internet yellow pages. In June and July 2007, respectively, plaintiff contracted with defendants Gomez and Flora to serve as brokers who would locate call centers in the Philippines. In exchange for their services, plaintiff agreed to pay Gomez and Flora a $1 commission for each valid sale completed by a call center they represented (*id.* at 19–21; Exh. A, B).

Gomez introduced plaintiff to defendant call centers Hubbub Inc., Digicall Inc., and Zynergy Solutions. Flora introduced plaintiff to defendant call centers LKU Commtech Central, 12C-Intelligence to Communicate, Inc., Intelcon Call Center, and Prolific Contract Central. Plaintiff contracted with these call centers. Plaintiff also contracted with defendant call centers Badoles, Inc., Pelatis BPO Solutions, Technocall Corp., and Contact Central Solutions, Inc. Plaintiff agreed to pay each call center a $25 commission per sale for seventy percent of total valid sales. The contracts with the respective call centers each contained a liquidated damages clause of $500 assessed against any fraudulent sale (*id.* at 23, 24; Exh. D).

Plaintiff also contracted with a third-party verification ("TPV") service provider. Upon a potential customer showing interest in plaintiff's subscription service, the call center was required to immediately connect the customer with the TPV service provider. The TPV service provider would then record the call and ask the customer a series of questions to consummate the sale. Call center agents were permitted to remain on the line during the TPV process but were required to remain silent unless the customer asked the agent a direct question. Another independent third-party company with whom plaintiff contracted would then review each TPV recording and report to plaintiff those recordings which it deemed to "pass" (sale) or "fail" (no sale) based upon perceived customer responses. Customers with whom sales were consummated were sent welcome letters from plaintiff indicating, *inter alia*, that they had fifteen days to cancel their subscriptions without charge. Thereafter, the customers were charged the subscription rate (*id.* at 25–27; Exh. E).

Plaintiff maintains it first learned of fraud perpetrated by defendants when it received an influx of customer complaints from actual customers and several state Attorneys General stating customers had not agreed to the subscriptions, had never received telephone calls, or had no recollection of being sent to a TPV service provider. Plaintiff agreed to cancel, credit, or refund the accounts of all complainants (*id.* at 28).

Plaintiff then investigated the complaints and determined it had been defrauded. Plaintiff learned that the call centers employed fraudulent techniques, including using digitized and recorded responses to the questions posed by the TPV service provider. In most instances, no customer was actually on the telephone line during the TPV process. Instead, the call center would simply play the digitized or recorded responses in such a way that the TPV review would classify the call as a valid sale. Plaintiff states this use of "doctored" audio was extremely difficult to detect, particularly given that the sales were deemed valid by the TPV reviewer (*id.* at 29–30).

Plaintiff claims to have paid over $250,000 in commissions on fraudulent sales due to the lag time between when a commission was paid and when a customer could lodge a complaint or cancel a subscription. Plaintiff maintains it also incurred penalties by way of

3

charge-back fees assessed by customers' billing providers for removing charges about which customers had complained. Plaintiff asserts it attempted to contact each defendant about the fraudulent activity and to discuss an opportunity to cure, but received no response. Plaintiff then ceased doing business with defendants (*id.* at 30–34).

On June 16, 2008, plaintiff filed suit in the Northern District of California against defendants alleging violation of the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. 6101 *et seq.*, breach of contract, negligence, and fraud. The same day, plaintiff served defendants with the summons and complaint via registered mail. The mailings were all returned. Plaintiff then collaborated with the Philippine law firm, SyCip Salazar Hernandez and Gatmaitan, to effectuate service by publication. On July 27, defendants were served by publication in a newspaper of general circulation in the Philippines, the *Philippine Star*. A publisher's affidavit was executed and notice of the publication was mailed to each defendant. To date, no defendant has served or filed a response.

On August 29, plaintiff moved for entry of default against defendants. On September 29, default was entered. Now, plaintiff moves for default judgment against defendants.

**ANALYSIS**

**1.    PERSONAL JURISDICTION.**

"For a court to exercise personal jurisdiction over a nonresident defendant, that defendant must have at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). California's long-arm statute authorizes the exercise of jurisdiction on any basis not inconsistent with the state or federal Constitution. Cal. Code Civ. Proc. § 410.10. As such, the analysis of personal jurisdiction collapses into a single inquiry under federal due process.

Personal jurisdiction may be either general or specific to the allegations in the complaint. *See Schwarzenegger*, 374 F.3d at 801–02 (distinguishing the two types of personal

4

1   jurisdiction). Plaintiff does not argue that general jurisdiction exists over defendants.
2   Rather, plaintiff alleges the Court has specific jurisdiction in this case. The Ninth Circuit
3   applies a three-prong test for analyzing claims of specific jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) The claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) The exercise of jurisdiction must comport with fair play and substantial justice, *i.e.,* it must be reasonable.

*Id*. at 802.

### A.   Purposeful Direction and Availment.

The first element is sometimes referred to as the "purposeful availment" prong, but "[d]espite its label, this prong includes both purposeful availment and purposeful direction. It may be satisfied by purposeful availment of the privilege of doing business in the forum; by purposeful direction of activities at the forum; or by some combination thereof." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et. L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006). "Evidence of availment is typically action taking place in the forum that invokes the benefits and protections of the laws in the forum. Evidence of direction generally consists of action taking place outside the forum that is directed at the forum." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1155 (9th Cir. 2006).

Here, plaintiff argues defendants purposefully directed activities at the forum. In purposeful-direction cases, courts normally employ the "effects" test of *Calder v. Jones*, 465 U.S. 783 (1984). The Ninth Circuit construes *Calder* as imposing three requirements: "the defendant allegedly [must] have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Yahoo! Inc.,* 433 F.3d at 1207.

Plaintiff highlights the following facts in support of its contention that defendants purposefully directed activities at the forum. *First*, defendants contracted with plaintiff, a

California-based company. *Second*, defendants agreed in those contracts that California law would govern any dispute and that California would be the venue. *Third*, defendants breached their contracts with plaintiff by collecting commissions on invalid sales. *Fourth*, defendants orchestrated a fraud directed to a California-based company and made fraudulent representations to a California-based company. *Fifth*, plaintiff paid defendants commissions on fraudulent sales and defendants improperly accepted those payments from the California-based company.

Plaintiff's allegations are sufficient to satisfy the intentional act requirement, as there is no reason to believe that defendants' purported acts were done involuntarily. Plaintiff has likewise properly alleged that defendants' conduct was expressly aimed at California. The express aiming requirement "is satisfied when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state." *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000). Plaintiff alleges defendants engaged in wrongful conduct including fraud and breach of contract targeted at plaintiff, a company defendants knew to be a resident of California. Moreover, the contracts explicitly provided they were governed by California law. While a choice-of-law provision alone would not be sufficient to confer jurisdiction, neither should it be ignored. *See AdVideo, Inc. v. Kimel Broadcast Group, Inc.*, 727 F. Supp. 1337, 1340–41 (N.D. Cal. 1989) (Jensen, J.) (further noting that had plaintiff breached the agreement, the defendant in that action "would have been entitled to the protection and benefits afforded by California law"). By the terms of the contracts, defendants could have reasonably expected they might be hauled into a California court. The third part of the "effects test" is also met as to defendants. It requires an allegation that the defendant "caus[ed] harm that the defendant [knew was] likely to be suffered in the forum state." *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002). Plaintiff's alleged harm of paying defendants commissions on fraudulent sales was suffered in California, as defendants presumably knew it would be. Accordingly, this prong is met.

### B.     Connection to Forum-Related Activities.

As to the second element of the specific jurisdiction test, plaintiff must show that its claims arise out of or relate to defendants' forum-related activities. In making this determination, the Ninth Circuit inquires whether plaintiff would have been injured but for defendants' conduct directed toward the forum state. *Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir. 1995); *Thomas Weisel Partners LLC v. BNP Paribas, et al.*, 2008 U.S. Dist. LEXIS 65936, *20 (N.D. Cal. 2008) (Patel, J.) (internal citation omitted).

There is little doubt that plaintiff's claims arise from defendants' forum-related activities. *First*, the complaint alleges that defendants breached their contracts, which were governed by California law. *Second*, the claims stem from defendants' sales of subscriptions with plaintiff, a California-based company, which in turn paid defendants commissions on fraudulent sales. *Third*, but for defendants' fraudulent conduct, the alleged harm to plaintiff would not have occurred. This prong is satisfied.

### C.     Reasonableness.

Because plaintiff has satisfied its burden under the first two prongs of the specific jurisdiction test, the burden now shifts to defendants to "'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Schwarzenegger*, 374 F.3d at 802 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–78 (1985)). Here, defendants have failed to plead or otherwise defend; consequently, no compelling reasons have been presented as to why the exercise of jurisdiction over them would be unreasonable. Presumably, had defendants filed a responsive pleading or otherwise appeared in this case, they might have emphasized a lack of geographic connection to the United States. It may be, for example, that no defendants own property in the United States, that all travel here infrequently if ever, and that all live and work exclusively in the Philippines. Even had such a concern been raised, however, it would be insufficient to render jurisdiction unreasonable. If the reasonableness inquiry were dictated by the extent of defendants' geographic ties to the forum alone, the purposeful availment and purposeful direction inquiries would be meaningless.

Although the burden on defendants is a relevant factor, the other fairness and reasonableness factors — the forum state's interest in adjudicating the dispute, plaintiff's interest in obtaining convenient and effective relief, judicial efficiency, and the shared interest of states "in furthering fundamental substantive social policies," *Burger King Corp.*, 471 U.S. at 476–77 (listing the factors) — weigh in favor of reasonableness. Plaintiff certainly has a strong interest in obtaining effective and efficient relief, and the integrity of this nation's markets would be undermined if foreign businesses could fleece those markets while standing beyond the water's edge.

To be sure, United States companies that outsource American jobs to low-wage countries are easy targets for scams. Laid-off workers in America would likely say that companies who want third-world labor should settle for third-world justice and that they should be required to sue the low-wage workers, if at all, only in the low-wage country rather than being allowed to have it both ways, *i.e.*, to have third-world labor *and* American justice. But, perhaps unfortunately, that is not the test.

In sum, the three-prong test for analyzing claims of specific jurisdiction has been met. Accordingly, personal jurisdiction over defendants is proper.

### 2. SERVICE OF PROCESS.

FRCP 4(f) directs how to effect service on an individual in a foreign country. An individual may be served at a place not within any judicial district of the United States "by an internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents." Fed. R. Civ. P. 4(f)(1). The Philippines is not a party to the Hague Convention. *See* Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters, http://travel.state.gov/law/info/judicial/judicial_686.html# (last visited Dec. 1, 2008).

Where "there is no internationally agreed means, or if an international agreement allows but does not specify other means, [service may be effectuated] by a method that is reasonably calculated to give notice." Fed. R. Civ. P. 4(f)(2). One such method is "any form

1  of mail that the clerk addresses and sends to the individual and that requires a signed receipt."
2  Fed. R. Civ. P. 4(f)(2)(C)(ii). On July 16, plaintiff employed this method by serving
3  defendants with the summons and complaint via registered mail using the addresses defendants
4  provided in their contracts with plaintiff. Notice was not effected by these mailings, however,
5  as evidenced by the fact that the mailings were returned to plaintiff. No forwarding addresses
6  were provided.

7  A second method of notice includes those "prescribed by the foreign country's law
8  for service in that country in an action in its courts of general jurisdiction." Fed. R. Civ. P.
9  4(f)(2)(A). Philippine Rule of Civil Procedure 14, Section 19 provides for proof of service by
10 publication. It states:

> If the service has been made by publication, service may be proved by the affidavit of the printer, his foreman or principal clerk, or of the editor, business or advertising manager, to which affidavit a copy of the publication shall be attached, and by an affidavit showing the deposit of a copy of the summons and order for publication in the post office, postage prepaid, directed to the defendant by registered mail to his last known address.

15 Plaintiff employed this method of notice by collaborating with the Philippine law firm,
16 SyCip Salazar Hernandez and Gatmaitan. On July 27, defendants were served by publication
17 in a newspaper of general circulation in the Philippines, the *Philippine Star*. In compliance
18 with Philippine law, a publisher's affidavit was executed and notice of the publication was
19 mailed to each named defendant in this action. Plaintiff states it is aware that the publication
20 reached defendant Pelatis BPO Solutions, as the law firm representing that defendant contacted
21 plaintiff indicating it had received the "ad clipping" and requesting a copy of the complaint.
22 Plaintiff sent the defendant a copy of its first amended complaint.

23 The common law has long "recognized that, in the case of persons missing or unknown,
24 employment of an indirect and even a probably futile means of notification is all that the
25 situation permits and creates no constitutional bar to a final decree foreclosing their rights."
26 *Mullane v. Cent. Hanover Bank & Trust Co. et al.*, 339 U.S. 306, 317 (1950) (allowing service
27 by publication); *accord Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1016–17
28 (9th Cir. 2002) (applying the reasoning in *Mullane* to allow alternative methods of service to

9

1  serve "an elusive international defendant"); *Lidas, Inc. v. U.S.*, 238 F.3d 1076, 1084 (9th Cir.
2  2001) (applying *Mullane* in support of proposition that the IRS more than met the standard to
3  provide notice "reasonably calculated, under all the circumstances, to apprise the interested
4  parties of the pendency of the action").

Because plaintiff employed methods of service reasonably calculated to give notice, including service by publication as prescribed by Philippine law, this order finds service of defendants was proper.

### 3. DEFAULT JUDGMENT.

Under FRCP 55(b)(2), a plaintiff can apply to the district court for a default judgment against a defendant that has failed to otherwise plead or defend against the action. Default judgments are generally disfavored as "cases should be decided upon their merits whenever reasonably possible." *Eitel v. McCool*, 782 F.2d 1470, 1472 (9th Cir. 1986). In the Ninth Circuit, a district court must consider the following factors when deciding whether or not to use its discretion in granting a motion for default judgment: (i) the possibility of prejudice to the plaintiff; (ii) the merits of plaintiff's substantive claims; (iii) the sufficiency of the complaint; (iv) the sum of money at stake in the action; (v) the possibility of a dispute concerning material facts; (vi) whether the default was due to excusable neglect; and (vii) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. *Id.* at 1471–72. Here, these factors favor entry of default judgment against defendants.

#### A. Merits and Sufficiency of the Complaint.

After entry of default, well-pleaded allegations in the complaint regarding liability and entry of default judgment are taken as true, except as to the amount of damages. *Fair Housing of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002). Thus, there can be no dispute as to the material facts. Additionally, the district court is "not required to make detailed findings of fact." *Id.* at 906. The merits of plaintiff's substantive claims are therefore considered together with the sufficiency of the complaint. Because plaintiff alleges that defendants breached their contracts and brings this motion for default judgment to obtain damages against defendants under those contracts, this is a breach of contract claim for the purpose of determining the

10

merits and sufficiency of the complaint. The second, third, and fifth *Eitel* factors weigh in favor of granting a default judgment.

In order to prevail in an action for breach of contract, plaintiff must show that (i) there is a contract, (ii) plaintiff performed, (iii) defendants breached, and (iv) there is resulting damage. *See Careau  & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1399 (1990). Here, the complaint establishes each of these elements. The complaint sufficiently alleges that plaintiff entered into written contracts with defendants for broker and telemarketing services and the declaration attached to the motion for default judgment suffices to show the parties' signatures on these contracts. The complaint further alleges that plaintiff performed all of its required obligations under the contracts, including paying commissions to defendants, or was excused from performing due to defendants' conduct. The complaint also properly alleges that defendants Gomez and Flora breached their contracts by referring plaintiff to unsuitable call centers who defrauded plaintiff by accepting commissions for fraudulently obtained sales and that defendant call centers breached their contracts by collecting commissions on those invalid sales. Finally, the complaint sufficiently alleges harm to plaintiff by contending that plaintiff paid commissions on invalid sales and incurred penalties by way of charge-back fees after customers complained to their billing providers about unauthorized subscription charges. Taking these well-pled allegations as true, plaintiff has sufficiently pled the elements necessary to state a breach of contract claim.

### B.     Remaining Factors.

The remaining *Eitel* factors likewise favor entry of default judgment. If this motion is not granted, plaintiff will be prejudiced as it will be denied its right to adjudicate its claims and will be left without a remedy. In general, the fact that a large sum of money is at stake disfavors default judgment. *Cf. Eitel*, 782 F.2d at 1472 (stating that the fact that three million dollars was at stake, when considered in light of the parties' dispute as to material facts, supported the court's decision not to enter judgment by default). Here, plaintiff asks for a large amount of damages: over nine million dollars. As stated earlier, however, whereas plaintiff's well-pleaded allegations as to liability are taken as true, those as to damages are not;

11

accordingly, the determination of relief discussed below finds plaintiff is entitled to amounts ranging from a low of $14,000 to a high of $637,500 as to the respective defendants. These amounts pale beside the three million dollars at stake as against the single defendant in *Eitel*. There is no evidence that defendants' failure to respond was the result of excusable neglect. They were properly served, have filed no responsive pleadings, and have never appeared in this action. Although federal policy favors decisions on the merits, FRCP 55(b) permits entry of default judgment in situations, such as this, where the defendants have failed to plead or otherwise defend. On balance, the *Eitel* factors weigh in favor of granting default judgment.

### C. Determination of Relief.

Plaintiff seeks a grand total of $9,879,718 from defendants. To calculate this amount, plaintiff took three steps.

*First*, plaintiff estimated the total number of fraudulent calls. It did so by adding together the number of calls made by each call center during approximately June 2007 to September 2007 that it could classify into one of four mutually exclusive categories: (i) termed "Post Failed" comprising calls that originally passed the TPV review but that plaintiff later learned were fraudulent; (ii) termed "Cancel" comprising calls that were canceled by the subscriber and that plaintiff believes were fraudulent; (iii) termed "Failed (status)/ Failed (TPV)/ Cancellation Reason" comprising calls that failed the TPV review with a reason for failure described by the TPV provider; and (iv) termed "Failed (Status)/ Failed (TPV)" comprising calls that failed the TPV review with no reason for failure described by the TPV

1  provider. Plaintiff found a total of 19,754 calls that fit in these four categories, broken down as
2  follows with respect to each call center:

| CALL CENTER | POST FAILED | CANCEL | FAILED (STATUS)/ FAILED (TPV)/ CANCELLATION REASON | FAILED (STATUS)/ FAILED (TPV) |
|---|---|---|---|---|
| Hubbub Inc. | 80 | 22 | 122 | 652 |
| LKU Commtech Central | 224 | 73 | 153 | 491 |
| I2C-Intelligence to Communicate, Inc. | 242 | 79 | 96 | 888 |
| Intelcon Call Center | 29 | 15 | 58 | 776 |
| Badoles, Inc. | 1275 | 349 | 298 | 1852 |
| Pelatis BPO Solutions | 1014 | 382 | 249 | 2504 |
| Prolific Contract Central | 28 | 14 | 65 | 442 |
| Technocall Corp. | 1181 | 509 | 0 | 1247 |
| Digicall Inc. | 1148 | 243 | 63 | 819 |
| Zynergy Solutions | 95 | 31 | 134 | 383 |
| Contact Central Solutions, Inc. | 309 | 115 | 56 | 949 |

*Second*, plaintiff multiplied the number of estimated fraudulent calls by the $500 liquidated damages amount provided for in the contracts with defendant call centers. The liquidated damages provision provided:

> All fraudulent sales found, which are proven by the customers and/or the PROVIDER's QCD, are grounds for five hundred dollars ($500.00) liquidated damages assessment against MARKETER for each fraudulent claim, which will be deducted from the weekly commissions. Such liquidated damages do not function as a punishment to MARKETER, but merely cover some of the costs associated with the consequences that fraudulent sales have upon PROVIDER. PROVIDER also reserves the right to seek prosecution and/or tortious claims of the individual(s) or PARTIES involved in the fraudulent activity mentioned above.

(First Amd. Compl. ¶ 24; Exh. D).

13

*Third*, plaintiff added the amount it paid in commission to defendant brokers pursuant to the terms of the broker agreements which provided:

> For all referred call centers which perform the GYP [i.e. Inc21] program Commission payments to the BROKER is one dollars [sic] ($1) per each approved valid sale completed by the center to which the BROKER represents.

(id. at ¶ 21; Exh. A, B). This amount was $2,718 as to Gomez and $0 as to Flora who was never paid any commission.

Plaintiff requests that judgment be entered in its favor against (i) each call center in the amount equal to the number of estimated fraudulent calls attributed to that call center multiplied by the $500 liquidated damages amount, (ii) each broker, jointly and severally with the call centers they represented, for the amount of damages attributed to those call centers, and (iii) Gomez, severally, for the $2,718 in commission paid to her for allegedly fraudulent sales by the call centers she represented.

Allegations of damage are not deemed true simply because of the defendant's default. Some proof of the amount is required. *Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977). Plaintiff acknowledges that "[i]t is possible that a small number of the calls in the four categories were not fraudulent" but states that the aggregate number nonetheless does not capture the total number of fraudulent calls and that it is therefore a conservative estimate. The estimated number of fraudulent calls is key to proving plaintiff's damages calculation. This order finds that only the first category of calls proved-up by plaintiff indicate fraud and that the remaining categories do not.

The first category comprises calls that originally passed the TPV review but that plaintiff later learned were fraudulent. Because plaintiff learned that these sales were fraudulent it was justified in including them in its calculation of fraudulent sales. The second category comprises calls canceled by the subscriber which plaintiff believes were fraudulent. That a subscriber cancelled, however, does not in and of itself suggest fraud. Presumably, had the subscriber indicated that it never approved the sale in the first place, plaintiff would have included the call in the first rather than the second category as it would have *learned* rather that simply *believed* that the cancellation was due to fraud. The third and fourth categories

14

1  comprise calls that failed the TPV review with a reason for failure either stated or unstated by
2  the TPV reviewer.  Because these calls failed the TPV review they never became
3  consummated sales.  Because these calls never became sales they can hardly be deemed
4  "fraudulent sales" so as to warrant $500 in liquidated damages assessed against each
5  "fraudulent sale."
6      Accordingly, this order awards liquidated damages in the amount of $500 per
7  fraudulent sale including only those calls attributed to the first category.  Defendants Gomez
8  and Flora are jointly and severally liable for those liquidated damages assessed against the call
9  centers they represented.  Gomez is also severally liable for the $1 commission she collected
10 for each fraudulent sale attributed to the first category made by the call centers she represented.

**CONCLUSION**

12     For all of the above-stated reasons, plaintiff's motion for default judgment against
13 defendants is **GRANTED**.

14 **IT IS HEREBY ORDERED:**

15     1.    Defendant Hubbub Inc. shall pay, jointly and severally with
16 defendant Gomez, liquidated damages of $40,000;

17     2.    Defendant LKU Commtech Central shall pay, jointly and
18 severally with defendant Flora, liquidated damages of $112,000;

19     3.    Defendant I2C-Intelligence to Communicate, Inc. shall pay,
20 jointly and severally with defendant Flora, liquidated damages of $121,000;

21     4.    Defendant Intelcon Call Center shall pay, jointly and severally
22 with defendant Flora, liquidated damages of $14,500;

23     5.    Defendant Badoles, Inc. shall pay, severally, liquidated damages
24 of $637,500;

25     6.    Defendant Pelatis BPO Solutions shall pay, severally, liquidated
26 damages of $507,000;

27     7.    Defendant Prolific Contract Central shall pay, jointly and
28 severally with defendant Flora, liquidated damages of $14,000;

8. Defendant Technocall Corp. shall pay, severally, liquidated damages of $590,500;

9. Defendant Digicall Inc. shall pay, jointly and severally with defendant Gomez, liquidated damages of $574,000;

10. Defendant Zynergy Solutions shall pay, jointly and severally with defendant Gomez, liquidated damages of $47,500;

11. Defendant Contact Central Solutions, Inc. shall pay, severally, liquidated damages of $154,500;

12. Defendant Gomez shall pay, severally, $1,323.

**IT IS SO ORDERED.**

Dated:  December 4, 2008.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE